# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**37celsius Capital Partners, L.P., et al.,**

        Plaintiffs,

        v.                               Case No. 20-CV-621

**Intel Corporation, et al.,**

        Defendants.

---

## DECISION AND ORDER

---

Defendants Intel Corporation ("Intel") and Care Innovations, LLC ("Care") have filed a "Motion for a Ruling that Plaintiffs are not Entitled to Claim Damages for 'Lost Profits and Value from the Lost Acquisition of Care.'" (ECF No. 24.) Essentially, the motion is one for partial summary judgment on that limited issue, and the parties have treated it as such, filing not only briefs but proposed findings of fact and supporting materials. The motion has been fully briefed and is ready for resolution. All parties have consented to the full jurisdiction of this court. (ECF Nos. 6, 7.)

1. Facts

Plaintiffs 37celsius Capital Partners, L.P. and 37celsius Capital Partners, LLC (collectively, "37celsius") specialize in developing technologies related to the healthcare

industry. (ECF No. 42, ¶ 1.) In July 2016 Intel and Care approached 37celsius, suggesting that 37celsius acquire of one Intel's wholly owned subsidiaries. (*Id.*, ¶ 3.) Around the same time Intel was pursuing a potential sale of Care to one of 37celsius's competitors, iSeed Ventures, LLC ("iSeed"). (*Id.*, ¶ 7.)

In December 2016 Intel informed 37celsius that its efforts to sell Care to iSeed had been unsuccessful and asked if 37celsius was still interested in acquiring a controlling interest in Care for $12,000,000. (ECF No. 42, ¶ 10.) 37celsius was interested (*Id.*, ¶¶ 11-12), and on January 4, 2017 (but with an effective date of June 6, 2016), Intel and 37celsius executed a Non-Disclosure Agreement and began negotiating an investment by 37celsius in Care (ECF No. 38, ¶ 14). The Non-Disclosure Agreement stated that it was being entered into "in connection with a possible strategic transaction involving Care Innovations Holdings, LLC (the "Transaction")." (ECF No. 28-2 at 1.)

In the Non-Disclosure Agreement the parties agreed to maintain the confidentiality of certain information disclosed by the other party. (ECF No. 28-2, ¶ 2.) The Agreement further provided that

> [e]ither party may terminate this Agreement at any time without cause upon written notice to the other party; *provided* that each party's obligations for Confidential Information disclosed during the term of this Agreement will survive any termination.

(*Id.*, ¶ 6) (emphasis in original.)

The Non-Disclosure Agreement also contained a provision entitled "Hold Harmless" that stated, in relevant part, that 37celsius and Intel each reserved "the right

2
Case 2:20-cv-00621-WED   Filed 10/18/21   Page 2 of 20   Document 47

to terminate discussions and negotiations at any time and for any reason or no reason."

(ECF No. 28-2, ¶ 9(a).) The Hold Harmless provision also stated:

> Under no circumstances will either party be liable to the other for any costs or damages of any kind including without limitation incidental, consequential, special or speculative damages, lost profits or loss of business, in connection with not moving forward to conclusion of the discussions or negotiations.

(*Id.*, ¶ 9(b).) In the Non-Disclosure Agreement Intel and 37celsius agreed that

> it would be imprudent and unreasonable to rely upon the expectation of entering into any contract about the subject matter of the discussions or negotiations pertaining to the Transaction. Any effort by either party to complete due diligence, negotiate, obtain financing, prepare contracts or otherwise perform any of its obligations will not be considered evidence of intent to be legally bound by this effort.

(*Id.*, ¶ 9(c).) And the Non-Disclosure Agreement provided that it could not be amended except in writing signed by a duly authorized representative of the parties. (*Id.*, ¶ 13(e).)

On January 19, 2017, five days after executing the Non-Disclosure Agreement, 37celsius emailed Intel a draft of a letter agreement and incorporated term sheet relating to 37celsius's proposed acquisition of a controlling interest in Care. (ECF No. 38, ¶ 20.) After revisions to 37celsius's initial draft, on January 31, 2017, Intel emailed 37celsius "the clean and final copy of the agreed term sheet between Intel and 37c." (*Id.*, ¶ 21.) The Term Sheet set forth the key terms and conditions of a proposed transaction whereby 37celsius and Intel would form a new limited liability company that would own and operate Care's parent, Care Innovations Holdings, LLC. (*Id.*, ¶ 24.) The terms and conditions of the Term Sheet were subject to 37celsius's "satisfactory commercial and legal due diligence and the

execution by the parties hereto or their authorized representatives of a definitive purchase agreement and any other documents or agreements necessary to effect the transaction contemplated hereby." (ECF No. 29-2 at 2) (all citations reflect the ECF pagination.)

The Term Sheet described the proposed transaction in this way:

> 37c will contribute its Cash Contribution to Newco in exchange for a 70% interest in Newco (on a fully diluted basis)
> Intel will contribute all of the outstanding membership interest of Care Innovations in exchange for a 15% interest in Newco (on a fully diluted basis)
> The remaining 15% fully diluted equity will be reserved for issuance as incentive compensation to existing and future management of Care Innovations, LLC.
> Such contributions are referred to as the "Transaction"

(*Id.*) 37celsius's Cash Contribution "will be $12,000,000 and will be paid directly to Newco in immediately available funds." (*Id.*) The "Closing Date" was set at "[n]o later than February 14, 2017." (*Id.*)

The Term Sheet contained a provision entitled "Exclusivity" in which Intel agreed that, "until such time as this Term Sheet has terminated,"

> neither Care Innovations nor any of its representatives, officers, employees, directors, agents, equityholders or affiliates nor Intel shall (a) initiate, solicit, entertain, negotiate, accept or discuss, directly or indirectly, any proposal or offer from any person or group of persons (other than 37c and its affiliates) to acquire all or any significant part of the business and properties, equity interests of Care Innovations and/or its subsidiaries, whether by merger, purchase of equity, purchase of assets or otherwise (an "Acquisition Proposal"), (b) provide any non-public information to any third party in connection with an Acquisition Proposal or (c) enter into any

agreement, arrangement or understanding requiring it to abandon, terminate or fail to consummate the Transaction with 37c.

(ECF No. 29-2 at 4.) The Term Sheet also contained a Confidentiality provision which stated that the Term Sheet is confidential to the parties and their representatives "and is subject to the Corporate Non-Disclosure Agreement entered into between 37c and Intel on June 6, 2016, which continues in full force and effect (the "Confidentiality Agreement")." (*Id.*) The Term Sheet further stated in relevant part that it

> will automatically terminate and be of no further force and effect upon the earlier of (a) the execution of a definitive purchase agreement by 37c and Intel, (b) mutual agreement of 37c and Intel and (c) written notice of termination of this Term Sheet by Intel, provided such termination notice shall be effective no earlier than February 2, 2017.

(*Id.* at 5.)

Two other provisions of the Term Sheet are relevant here. In a provision entitled "No Binding Agreement" the parties agreed that

> [t]his Term Sheet reflects the intention of the parties, but for the avoidance of doubt, neither this Term Sheet nor its acceptance shall give rise to any legally binding or enforceable obligation on any party, except with regard to the sections hereof entitled "Confidentiality", Exclusivity", "Governing Law", and "Third Party Beneficiaries". No contract or agreement providing for any transaction involving Care Innovations shall be deemed to exist between 37c and any of its affiliates and Intel unless and until a final definitive agreement has been executed and delivered.

(ECF No. 29-2 at 5.) And, finally, in a provision entitled "No Reliance," the parties agreed in relevant part that

> neither this Term Sheet nor any negotiations or discussions between any party obligates either party to enter into any further agreement. Moreover,

unless and until the parties sign and deliver a definitive agreement with respect to a particular transaction, neither party will be under any legal obligation of any kind whatsoever regarding any transaction by virtue of this Term Sheet or any written or oral expression with respect to any transaction (including without limitation the preparation or signing of any letter of intent or term sheet) by any of the parties or their representatives except for the matters specifically agreed to in this Term Sheet.

(*Id.*) Nothing in the Term Sheet provided either 37celsius or Intel with the right to compel the other to close the transaction proposed in the Term Sheet. (ECF No. 38, ¶ 28.)

Over the next several days representatives of Care talked to each other about the status of Intel's negotiations not only with 37celsius but also with iSeed. (ECF No. 42, ¶¶ 21-23.)

On February 4, 2017, 37celsius sent an email to Intel stating that it had "the money committed." (ECF No. 29-3 at 2.) Intel and 37celsius agreed upon proposed final transaction documents. (ECF No. 38, ¶ 40.) Pursuant to a February 13, 2017 Letter Agreement, Intel and 37celsius signed the proposed final transaction documents and exchanged "advance copies" of the signature pages. (*Id.*, ¶ 41.) Notwithstanding the advance exchange of signature pages, the Letter Agreement stated that the proposed final transaction documents "shall not be deemed executed or delivered by any of the parties" but "shall be held by representatives of the parties in escrow." (*Id.*, ¶ 43.) Under the Letter Agreement, the transaction was set to close upon "written notice from Intel…that 37celsius has provided to Intel confirmation satisfactory to Intel in its sole and absolute discretion that 37celsius will meet" its financial obligations. (*Id.*, ¶ 44.)

6
Case 2:20-cv-00621-WED   Filed 10/18/21   Page 6 of 20   Document 47

The Letter Agreement further stated that, upon "written notice from Intel to 37celsius at or after 3:00 p.m. Pacific Standard Time on February 14, 2017 that Intel has not received such satisfactory confirmation by such time…the advance copies of the signature pages shall be returned to the respective Parties that provided them," the proposed final transaction documents "shall not become effective or be deemed executed or delivered," and "the Closing shall not occur." (ECF No. 38, ¶ 45.)

On February 14, 2017, Intel wrote to 37celsius that it had "not received satisfactory confirmation that 37celsius" could meet its financial obligations, that the proposed final transaction documents therefore "shall not become effective or be deemed executed or delivered," and that "the Closing shall not occur." (ECF No. 38, ¶ 47.) In a separate communication, given its understanding that 37celsius was "working to get the funding in place by next Tuesday, February 21st," Intel wrote to 37celsius with a "suggested path forward." (ECF No. 27-2 at 2.) Intel stated that it intended to "go to our committee within the next 24 hours to get the ok for a delayed signing and closing next Tuesday," and "we would strongly encourage you to get the entire $12 million in funding lined up for next Tuesday." (*Id.*)

On February 20, 2017, 37celsius wrote to Intel that "there are a few moving parts which makes it hard to be done by tomorrow." (ECF No. 27-3 at 2.) 37celsius stated that it had "a plan for the $12MM, where we have $9.5 committed, and expecting commitments for the remainder to come in tomorrow." (*Id.*) Later that same night

37celsius informed Intel that its "efforts continued to make progress today by getting some more from existing investors and getting closer to $10MM." (ECF No. 27-4 at 2.) 37celsius stated that it was "getting very close and working all cylinders[.]" (*Id.*)

On February 21, 2017, Intel had a phone conference with iSeed's counsel to discuss issues relating to a deal with iSeed. (ECF No. 42, ¶ 29.)

On February 23, 2017, 37celsius informed Intel that it had "closed on commitments of $12.25MM, we are expecting another $2.5MM tomorrow." (ECF No. 27-5 at 2.) 37celsius stated that it had set up an escrow account and had issued wiring instructions in anticipation of closing and had "$1.5MM in as of today, another $1.25MM coming in tomorrow." (*Id.*)

On March 1, 2017, 37celsius emailed Intel, stating in relevant part:

> We are at the 1 yard line and ready to close, w only a few days away, however because of the lack of being able to communicate back to the investors we got delayed in getting the last piece across the finish line and why I wanted to talk to you last Friday and earlier in the week to reconfirm things.
> We would bring $14-$14.4MM committed (which is slightly more than we had agreed), drop $10MM into care at close and the remaining $4MM 3-6 months in. I have shared the commitments w you so far and that the loan is approved and ready to go ($6MM) and we are pooling the cash into an escrow account, so we can turn around quickly to close.

(ECF No. 29-5 at 3.) Intel informed 37celsius later that same day that it had decided to sell a controlling interest in Care to someone other than 37celsius. (ECF No. 38, ¶ 54.) That same day, Intel entered into an agreement to sell to iSeed a controlling share of Intel's equity interest in Care. (ECF No. 42, ¶ 36.)

8

Two years later, on April 19, 2019, 37celsius sued both Intel and Care in Wisconsin Circuit Court. The complaint contained four causes of action, each against both Intel and Care: breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and promissory estoppel. (ECF No. 1-1 at 13-15.) The state court dismissed all but the breach of contract claim against Intel and all but the promissory estoppel claim against Care. (ECF No. 1-2.) The action was subsequently removed to this court based on the diversity of the citizenship of the parties. (ECF No. 1, ¶ 11.)

37celsius alleges that Intel breached the Exclusivity provision in the Term Sheet and seeks damages, including "attorneys' fees and costs" as well as "lost profits and value from the lost acquisition of Care[.]" (ECF No. 4-35, ¶ 57.)

## 2. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. ex rel. Wallace v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling

question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

3. **Analysis**

In moving for summary judgment, the defendants contend that the Hold Harmless provision in the Non-Disclosure Agreement bars 37celsius's claim for lost profits and value from the lost acquisition of Care. (ECF No. 25 at 11-13) (all citations reflect the ECF pagination.) They separately argue that the claim for lost profits and value from the lost acquisition of Care fails because the Term Sheet did not entitle 37celsius to acquire Care. (*Id.* at 13-19.) And, thirdly, the defendants contend that 37celsius's claim for lost profits fails because it had no ability to close the transaction proposed in the Term Sheet. (*Id.* at 19-21.)

**3.1 Hold Harmless**

In opposing the defendants' motion, 37celsius argues that the Hold Harmless provision in the Non-Disclosure Agreement does not limit its remedies for Intel's breach of the Term Sheet. (ECF No. 39 at 23) (all citations reflect the ECF pagination.) It argues that the Hold Harmless provision "only protects Intel from liability for lost profits 'in connection with not moving forward to conclusion of the discussions or negotiations.'" (*Id.*) It contends that the Hold Harmless provision does not apply to a claim for breach of the Term Sheet, which is the basis of its claim against the defendants. (*Id.* at 23-24.)

"Defendants are being sued because they entered into the completely separate Term Sheet that gave 37celsius the exclusive right to acquire Care, and Defendants breached that agreement from day one by continuing to negotiate with and ultimately selling to another party." (*Id.* at 23.)

The Term Sheet expressly states that it is "subject to the Corporate Non-Disclosure Agreement entered into between 37c and Intel on June 6, 2016, which continues in full force and effect." (ECF No. 29-2 at 4.) 37celsius argues that, because this language is found in the Term Sheet's "Confidentiality" section, it "incorporated the NDA's confidentiality provisions, but not other NDA provisions." (ECF No. 39 at 24.) But 37celsius never identifies what provisions of the Non-Disclosure Agreement it characterizes as its "confidentiality provisions." Indeed, the entire Non-Disclosure Agreement is about the mutual exchange of confidential information as the parties negotiate a transaction. Nothing in the Term Sheet's Confidentiality provision suggests that it intended to incorporate some but not all of the terms of the Non-Disclosure Agreement. Contrary to 37celsisus's contention, the Term Sheet is not "completely separate" from the Non-Disclosure Agreement. The Term Sheet is subject to the entire Non-Disclosure Agreement.

For its part the Non-Disclosure Agreement states that, "[u]nder no circumstances will either party be liable to the other for any costs or damages of any kind including without limitation…lost profits or loss of business, in connection with not moving

forward to conclusion of the discussions or negotiations." (ECF No. 28-2, ¶ 9(b).) 37celsius contends that Intel's interpretation of this provision would leave Intel with no remedy should 37celsius "wrongly disclose[] confidential information obtained from Intel under the NDA[.]" (ECF No. 39 at 23-24.) But that's not true. The Non-Disclosure Agreement expressly states that "[t]he receiving party will be liable for any breach by its Representatives of the terms of this Agreement[.]" (ECF No. 28-2, ¶ 2(a).)

Trying to avoid summary judgment, 37celsius contends that it is not suing Intel because it failed to move forward with discussions or negotiations but rather because it breached its exclusivity obligations under the Term Sheet. (ECF No. 39 at 23.) On that point Intel seems to concede that 37celsius can pursue damages for Intel's alleged breach of the Exclusivity provision in the Term Sheet notwithstanding the Hold Harmless provision in the Non-Disclosure Agreement, replying that "37c may pursue damages for fees incurred while negotiating with Intel in alleged reliance on the Exclusivity provision." (ECF No. 41 at 5; *see also* ECF No. 25 at 17; ECF No. 41 at 3) (all citations reflect ECF pagination.)

But the fact that 37celsius can pursue some damages for Intel's alleged breach of the Exclusivity provision does not mean that it can recover lost profits and value. "Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made." Restatement (Second) of Contracts § 351 (Am. Law Inst. 1981). Because the Non-Disclosure Agreement

expressly states that under no circumstances will either party be liable to the other for any costs or damages of any kind, including lost profits or loss of business, in connection with not moving forward to conclusion of the negotiations, Intel had no reason to foresee that a probable result of a breach of the Exclusivity provision in the Term Sheet would be exposure to lost profits and lost value resulting from 37celsius not acquiring Care.

Indeed, the Exclusivity provision itself provides: "In *consideration of the expenses that 37c has incurred and will incur* in connection with the Transaction …". (ECF No 29-2 at 4) (emphasis added.) Intel may have been able to foresee that its alleged breach of the Exclusivity provision would result in it having to pay 37celsius the expenses 37celsius incurred in negotiating to acquire Care. But it had no reason to foresee possibly having to pay 37celsius's lost profits and value in the event it breached the Exclusivity provision. *Cf. Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146-47 (Del. 2009).

If the Term Sheet gave 37celsius the right to acquire Care—as 37celsius contends it did—then Intel may have had reason to foresee possibly having to pay 37celsius's lost profits and value should it sell Care to someone else. (*See* ECF No. 39 at 14-17.) But the Term Sheet did not give 37celsius that right; it only provided 37celsius with the exclusive right to negotiate with Intel regarding acquiring a controlling interest in Care until Intel terminated the negotiations. Concluding otherwise would ignore the Term Sheet's No Binding Agreement, No Reliance, and Termination provisions and the Non-Disclosure Agreement's provision stating that "[t]he parties acknowledge that it would be

imprudent and unreasonable to rely upon the expectation of entering into any contract about the subject matter of the discussions or negotiations." *See Elliott Assocs. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998) ("[A] court interpreting any contractual provision … must give effect to all terms of the instrument, must read the instrument as a whole, and if possible, reconcile all the provisions of the instrument.").

Still, 37celsius maintains that it would have acquired Care but for Intel's alleged breach of the Exclusivity provision. (ECF No. 39 at 27, 29.) It claims that it "would have had the funds available to close on the transaction long before Intel could have negotiated and closed on the transaction with iSeed" had Intel told 37celsius that it was "considering terminating the Exclusivity Provision." (*Id.* at 29.) In support of its position, 37celsius submits a declaration from Alexander Kempe, its founder, who states that

> [i]f Defendants had made 37celsius aware that they were considering terminating 37celsius's exclusive right to acquire Care before Defendants had any communication with iSeed or discussions about the sale of Care to iSeed, then I *believe* 37celsius would have had the funds available to close on the transaction long before Intel could have negotiated and closed on the transaction with iSeed.

(ECF No. 36, ¶ 19) (emphasis added).

Even putting aside that Kempe merely speculates that 37celsius would have had the funds available (and the evidence suggests otherwise), Intel could have terminated the Term Sheet even if 37celsius had the funds available to close the transaction. (*See* ECF No. 28-2, ¶ 9(a) ("Each party further acknowledges and agrees that each party reserves the right to terminate discussions and negotiations at any time and for any reason or no

14

reason."); *see also* (ECF No. 29-2 at 5, ¶ "Termination.")). As such, the fact that 37celsius allegedly would have had the funds available to close the transaction does not demonstrate that it would have acquired Care. "The law does not permit a recovery of damages which is merely speculative or conjectural." *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1958); *see also* Restatement (Second) of Contracts § 352 (Am. Law Inst. 1981) ("Uncertainty as a Limitation on Damages"). Because it is uncertain that 37celsius would have acquired Care even if it had the funds available to close the transaction, 37celsius cannot on that basis recover lost profits and value.

*SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330 (Del. 2013), upon which 37celsius relies, does not require a different outcome. The Delaware Supreme Court's narrow holding in *SIGA* was grounded on "two key factual findings": that the parties "expressly agreed" to negotiate in good faith and that, "but for SIGA's bad faith negotiations, the parties would have consummated a license agreement." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 351 (Del. 2013). There was no express agreement to negotiate in good faith here. Nor could a factfinder conclude that, but for Intel's alleged breach of the Exclusivity provision, 37celsius and Intel would have closed the transaction—again, both parties could terminate negotiations "for any reason." (ECF No. 28-2, ¶ 9(a).) As such, the factual findings grounding *SIGA* are unsupported by the record here, making 37celsius's reliance on that case unpersuasive.

**3.2 Care's Liability for Lost Profits and Value**

In their motion the defendants separately argue that 37celsius "is not pursuing, and cannot pursue, Care itself for 'lost profits and value from the lost acquisition of Care.'" (ECF No. 25 at 21.) Based on their belief that 37celsius is not pursuing such a claim against Care itself, the defendants' motion does not expressly state that it is seeking a ruling that 37celsius is not entitled to pursue such a claim against Care. Rather, they are seemingly seeking confirmation from 37celsius (and perhaps from the court) that 37celsius indeed is not actually pursuing such a claim against Care itself.

To the extent they were seeking that confirmation from 37celsius, they did not get it. In responding to this aspect of the defendants' motion, 37celsius argues that its claim against Care is for promissory estoppel based on Care's promise "that 37celsius would have the exclusive right to solicit and negotiate an agreement to acquire a controlling interest in Care." (ECF No. 39 at 30.) As damages, it argues that Care must "pay 37celsius for the harm proximately resulting from Care's failure to fulfill its promise." (*Id.*) Those damages could include lost profits and value from the transaction not closing. (*Id.* at 32.)

Having not received that confirmation, Intel responds that 37celsius's lost profits claim against Care "fails for the same reasons" as its lost profits claim against Intel, and also that "Care had no right to sell Intel's property and 37c could not have 'reasonably relied' on any promise to the contrary." (ECF No. 41 at 14.)

16

Case 2:20-cv-00621-WED   Filed 10/18/21   Page 16 of 20   Document 47

Care was Intel's wholly owned subsidiary. (ECF No. 38, ¶ 4.) The letter from 37celsius to Intel accompanying the draft Term Sheet reads: "[W]e are pleased to provide this letter, which sets forth the key terms and conditions of a proposed transaction whereby 37c or one of its affiliates would invest $12 million in Care Innovations for a 70% interest in Care Innovations, with Intel Corporation *retaining* a 15% interest…" (ECF No. 30-2 at 2) (emphasis added). A parent company and its wholly owned subsidiary may be separate legal entities, but a wholly owned subsidiary cannot independently sell its parent company's interest because it by definition does not own that interest. *Cf. Mitchell v. Hawley*, 83 U.S. 544, 550 (1872) ("No one in general can sell personal property and convey a valid title to it unless he is the owner or lawfully represents the owner."). This is reflected in the Non-Disclosure Agreement: "[w]ithout limitation of the foregoing, the timing and content of any communications by [37celsius] or its Representatives with any employee of Care Innovations will be subject to Intel's prior written consent and approval." (ECF No. 28-2, ¶ 12.) Thus, 37celsius could not reasonably rely on any promise Care made to sell Intel's shares.

That said, it is unclear what promise Care ever made to 37celsius. Even at this summary judgment stage, 37celsius does not offer any evidence of such a promise, relying instead on an illusory "[t]he evidence will show" to support its claims. (ECF No. 39 at 30.) But summary judgment is the "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept

17
Case 2:20-cv-00621-WED   Filed 10/18/21   Page 17 of 20   Document 47

its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (internal citations omitted). With one exception, the emails attached to the declaration of counsel for 37celsius are either between Care personnel (ECF No. 35-2 at 1-2, 5-9, 11-21, 31, 32-37, 39-47, 49, 51), Care and Intel personnel (*Id.* at 2-4, 10, 22-29, 38, 48), Intel and 37celsius personnel (*Id.* at 31, 53) or Intel and Care personnel and their attorneys (*Id.* at 50). That lone exception is a February 24, 2017 email from 37celsius's Kempe to Care's Randy Swanson, in which Kempe is trying to "keep [Randy] in the loop and get any help [37celsius] can from you and team to hold out!!" (*Id.* at 31.)

A few other emails suggest that Swanson and Kempe may have been communicating directly, as where Swanson discusses with other Care employees Kempe's enthusiasm. (*See, e.g.*, ECF No. 35-2 at 6.) But in none of the evidence presented do Care personnel make any sort of a promise to Kempe or 37celsius. In fact, several of these communications suggest, as the Non-Disclosure Agreement makes clear, that Care personnel were not to speak directly with 37celsius personnel about the possible transaction. (*See, e.g.*, *id.* at 12) (Care's Kevon Kothari: "has Intel gotten what they need from Alexander?" Care's Bryan Pruden: "I don't know; Intel doesn't communicate with me.") Even viewing these emails in the light most favorable to 37celsius, 37celsius has failed to show that Care made any sort of promise to 37celsius. Without any evidence of such a promise, 37celsius cannot recover lost profits and value.

18
Case 2:20-cv-00621-WED   Filed 10/18/21   Page 18 of 20   Document 47

A claim for promissory estoppel requires both a promise and reasonable reliance on this promise. *See Chrysler Corp. (Del.) v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003) (citing *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000)). 37celsius has not presented evidence of either in a way sufficient to preclude summary judgment. Moreover, given that 37celsius could not have reasonably expected to acquire Care, this is not a case where justice would require enforcing whatever promise Care may have made to 37celsius. *Compare with Chrysler Corp. v. Quimby*, 144 A.2d 123, 133-34 (Del. 1958) (finding that justice required enforcement of a promise made when the parties' standing franchise agreement was breached).

4. **Conclusion**

For the reasons stated herein, the defendants' motion "Motion for a Ruling that Plaintiffs are not Entitled to Claim Damages for 'Lost Profits and Value from the Lost Acquisition of Care'" is granted.

**IT IS THEREFORE ORDERED** that defendants' motion for a ruling that plaintiffs are not entitled to claim damages for "Lost Profits and Value from the Lost Acquisition of Care" is **GRANTED**.

IT IS FURTHER ORDERED that plaintiff's motion to seal confidential documents is also GRANTED. ECF No. 35-2 shall be unsealed and publicly filed.

Dated at Milwaukee, Wisconsin this 18th day of October, 2021.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge