UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

37CELSIUS CAPITAL PARTNERS, L.P., et al.,

                 Plaintiffs,

v.                                             Case No. 20-CV-621

INTEL CORPORATION, et al.,

                 Defendants.

## ORDER ON MOTION TO RECONSIDER

**1. Background and Procedural History**

This action relates to the efforts of plaintiffs 37celsius Capital Partners, L.P. and 37celsius Capital Partners, LLC (collectively 37celsius) to acquire a controlling interest in one of defendant Intel Corporation's wholly owned subsidiaries, co-defendant Care Innovations, LLC. Intel called off the deal after it failed to receive "satisfactory confirmation" that 37celsius could meet its financial obligations. (ECF No. 38, ¶ 47.) Eventually, Intel sold the controlling interest in Care to one of 37celsius's competitors, iSeed. (ECF No. 42, ¶ 36.)

On April 19, 2019, 37celsius sued both Intel and Care in Wisconsin Circuit Court. The complaint contained four causes of action, each against both Intel and Care: breach

of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and promissory estoppel. (ECF No. 1-1 at 13-15.) The state court dismissed all but the breach of contract claim against Intel and all but the promissory estoppel claim against Care. (ECF No. 1-2.) The action was subsequently removed to this court based on the diversity of the citizenship of the parties. (ECF No. 1, ¶ 11.)

On May 7, 2021, the defendants filed a motion for partial summary judgment, arguing that 37celsius was not "entitled to claim damages for 'lost profits and value from the lost acquisition of Care'" for three reasons:

> (1) the Hold Harmless provision in the Non-Disclosure Agreement bars 37celsius's claim for lost profits and value from the lost acquisition of Care (ECF No. 25 at 11-13) (all citations reflect the ECF pagination);
> 
> (2) 37celsius's claim for lost profits and value from the lost acquisition of Care fails because the Term Sheet did not entitle 37celsius to acquire Care (*Id.* at 3-19); and
> 
> (3) 37celsius's claim for lost profits fails because it had no ability to close the transaction proposed in the Term Sheet. (*Id.* at 19-21.)

The court agreed and granted the defendants' motion. (ECF No. 47.) 37celsius—over six months later and with new counsel—now asks the court to reconsider that decision. (ECF No. 57.)

**2. Applicable Law**

"[T]his Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 932

(7th Cir. 2018) (quoting *Quaker Alloy Casting Co. v. Gulfco Industries, Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988)). "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656, 665 (N.D. Ill. 1982)). Consequently, "[a] party may not use a motion for reconsideration to introduce new evidence that could have been presented earlier." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (citing *Caisse Nationale de Credit Agricole*, 90 F.3d at 1269). Nor is reconsideration an "appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole*, 90 F.3d at 1269. "[D]eveloping an argument for the first time in a motion to reconsider is too late." *Bloch v. Frischholz*, 587 F.3d 771, 784 n.9 (7th Cir. 2009) (citing *Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009) ("[A]ny arguments … raised for the first time in [a] motion to reconsider are waived.")).

### 3. Analysis

37celsius argues that the court's decision is "manifestly incorrect" because it is "contrary to the Delaware Supreme Court's decisions in *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330 (Del. 2013) ('*SIGA I*'), and *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108 (Del. 2015) ('*SIGA II*')." (ECF No. 58 at 1.) It argues that the court "misapplied *SIGA I* and *SIGA II*" when it concluded that the Term Sheet was not a Type II

3
Case 2:20-cv-00621-WED   Filed 08/04/22   Page 3 of 10   Document 79

agreement. (*Id.* at 17.) Specifically, it argues that the court only reached that conclusion because it found "no express agreement to negotiate in good faith in the Term Sheet," and that the court's reliance on that finding was "manifestly incorrect" because *SIGA I*, *SIGA II*, and the Delaware Supreme Court's recent decision in *Cox Communications, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752 (Del. Mar. 3, 2022), show that "such express language" is not required "to create a Type II agreement." (ECF No. 72 at 2-3) (all citations reflect the ECF pagination.)

In response, the defendants point out that the court "has already analyzed and found distinguishable" *SIGA I* and *SIGA II*. (ECF No. 61 at 4, 9-12) They also argue that *Cox* "did not change the law in Delaware, is fully consistent with *SIGA I*, and confirms only that the Term Sheet was not a Type II agreement." (*Id.* at 9.) Regardless, they maintain that the "Term Sheet is not a Type II agreement under the standard." (*Id.* at 8.)

As stated in *Cox Communications, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752 (Del. Mar. 3, 2022):

> Delaware law has long recognized "that parties may make an agreement to make a contract…if the agreement specifies all the material and essential terms[,] including those to be incorporated in the future contract. Under the traditional rule, the absence or indefiniteness of material terms generally rendered an agreement unenforceable. In *SIGA I*, however, we recognized that parties could enter into two types of enforceable preliminary agreements. Type I agreements reflect a consensus "on all the points that require negotiation" but indicate the mutual desire to memorialize the pact in a more formal document. In Type II agreements, the parties "'agree on certain major terms, but leave other terms open for future negotiation.'" Type I agreements are fully binding; Type II agreements "do [] not commit the parties to their ultimate contractual

objective but rather to the obligation to negotiate the open issues in good faith.

*Cox Commc'ns, Inc.*, 273 A.3d at 761.

37celsius argued in its response to the defendants' motion for summary judgment that a preliminary agreement does not need an express good faith provision to be considered a Type II agreement. (*See* ECF No. 39 at 20, 21, 24) (all citations reflect the ECF pagination.) It cited *SIGA I* to support those arguments. For example, 37celsius argued that

> Defendants emphasize that there is no "good faith" provision in the Term Sheet. They claim that this distinction pulls this case out from under *Siga*. That is not the case. In *Siga*, the Court emphasized the breach of a specific good faith provision as an example to demonstrate that the selling party had a duty to negotiate toward a final agreement from which a jury could reasonably conclude that the plaintiff would have recovered lost profits.

(*Id.* at 21.) Similarly, it argued that

> Intel argues that *Siga I* can only apply to preliminary agreements with express good faith obligations. *Siga I*, however, did not so hold, instead referring to "Type II preliminary agreement(s)," which need not have express good faith provisions but do have implied obligations of good faith.

(*Id.* at 26.)

The court, as the defendants note, addressed those arguments and *SIGA I* in its decision. Distinguishing the Term Sheet from the agreement at issue in *SIGA I*, the court concluded that

> The Delaware Supreme Court's narrow holding in *SIGA* was grounded on "two key factual findings": that the parties "expressly agreed" to negotiate

> in good faith and that, "but for SIGA's bad faith negotiations, the parties would have consummated a license agreement." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 351 (Del. 2013). There was no express agreement to negotiate in good faith here. Nor could a factfinder conclude that, but for Intel's alleged breach of the Exclusivity provision, 37celsius and Intel would have closed the transaction—again, both parties could terminate negotiations "for any reason." (ECF No. 28-2, ¶ 9(a).) As such, the factual findings grounding *SIGA* are unsupported by the record here, making 37celsius's reliance on that case unpersuasive.

(ECF No. 47 at 15.) 37celsius's argument that the court "misapplied *SIGA* and *SIGA II*" amounts to little more than an impermissible request that the court reconsider arguments it previously rejected.

Nevertheless, 37celsius maintains that the Delaware Supreme Court's decision in *Cox*, justifies reconsideration. (ECF No. 58 at 2.) According to 37celsius, *Cox* makes clear that "the absence of an express 'good faith' provision is no impediment to the formation of a Type II agreement." (*Id.* at 17 (citing *Cox Commc'ns, Inc.*, 273 A.3d at 760-62).)

At issue in *Cox* was a single term of a settlement agreement between Cox Communications and Sprint Corporation, T-Mobile's predecessor-in-interest. *Cox Commc'ns, Inc.*, 273 A.3d at 755. That term provided that

> [b]efore Cox or one of its Affiliates (the "Cox Wireless Affiliate"), begins providing Wireless Mobile Service (as defined below), the Cox Wireless Affiliate will enter into a definitive MVNO agreement with a Sprint Affiliate (the "Sprint MVNO Affiliate") identifying the Sprint MVNO Affiliate as a "Preferred Provider" of the Wireless Mobile Service for the Cox Wireless Affiliate, on terms to be mutually agreed upon between the parties for an initial period of 36 months (the "Initial Term").

*Id.* at 756. In other words, the term provided that, before Cox "offered wireless mobile services to its customers, it would enter into a 'definitive' exclusive provider agreement with Sprint 'on terms to be mutually agreed upon between the parties for an initial period of 36 months[.]'" *Id.* at 755. Applying *SIGA I*, the Delaware Supreme Court concluded that the term is "a Type II preliminary agreement" because it "reflects 'agreement on certain major terms but leaves other terms open for future negotiation.'" *Id.* at 761.

As 37celsius points out, the court "was unanimous" in reaching that conclusion. (ECF No. 58 at 20.) In her concurring opinion, Justice Valihura agreed that the term "can be read as a Type II agreement." *Cox Commc'ns, Inc*, 273 A.3d at 761 (Valihura, J., concurring in part and dissenting in part). She described Type II agreements in more detail than the majority opinion, noting that "a party to a Type II preliminary agreement is barred 'from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'" *Id.* at 769 (internal citations omitted).

The Term Sheet at issue here allowed Intel to do exactly that: the "Termination" provision stated that either party could unilaterally terminate the Term Sheet with written notice. (ECF No. 29-2 at 5; ECF No. 47 at 5.) That provision further demonstrates that the Term Sheet is not a Type II agreement. Nothing in *Cox* suggests otherwise.

Likewise, nothing in *Cox* suggests that the Delaware Supreme Court departed from its conclusion in *SIGA I* that a finding that the parties would have consummated an agreement but for bad faith negotiations is necessary for concluding that the parties had entered into a Type II preliminary agreement. *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 351 (Del. 2013); *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1142 (Del. 2015) (Valihura, J., concurring in part and dissenting in part) ("*SIGA I*, in that respect, does not diverge from bedrock contract law establishing that reasonably certain proof is a predicate to an award of lost profits."). 37celsius does not argue to the contrary, nor does it present new evidence to suggest that it and Intel would have consummated an agreement but for Intel's bad faith. (ECF No. 47 at 15; ECF No. 61 at 15-16.)

Above all, it is unclear that *Cox* holds, as 37celisus argues that it does, that "the absence of an express 'good faith' provision is no impediment to the formation of a Type II agreement." (*See* ECF No. 58 at 2; ECF No. 72 at 4.) The term at issue in *Cox* did not have "an express good faith provision," but the court did not explicitly say that the term was a Type II agreement despite not having such a provision. In fact, the majority offered little explanation as to why it concluded that the term was a Type II agreement at all. *See Cox Commc'ns, Inc.*, 273 A.3d at 760-62.

Even assuming that *Cox* held that "the absence of an express 'good faith' provision is no impediment to the formation of a Type II agreement," nothing in that

decision requires the court to reconsider its conclusion that the Term Sheet is not a Type II agreement. Therefore, 37celsius's motion to reconsider on the basis that the court's decision was "manifestly incorrect under Delaware law" is denied.

There is also no reason for the court to reconsider its conclusion that the "Term Sheet is subject to the entire Non-Disclosure Agreement" and that 37celsius's claim for lost profits is barred as a result. (ECF No. 47 at 11.) 37celsius argues that the court should reconsider that conclusion for two reasons: (1) Section 13(e) of the Non-Disclosure Agreement "expressly limited its reach" and (2) the Term Sheet should prevail "if there were a conflict" between the Term Sheet and its Non-Disclosure Agreement. (ECF No. 58 at 24.)

37celsius made the first argument in its response to the defendants' motion for partial summary judgment:

> Finally, the NDA on its face cannot impact the Term Sheet or undermine 37celsius's rights under it. The NDA says, "[a]ny other agreements between the parties… will not be affected by this Agreement…". And yet, Defendants would use a twisted reading of the NDA to render all of the separate Term Sheet meaningless, crafting for Intel a complete liability shield over their breach of the Term Sheet.

(ECF No. 39 at 24-25 (citing ECF No. 27-1 at 7 (Section 13(e) of the NDA)).) The court rejected that argument, stating: "Contrary to 37celsisus's contention, the Term Sheet is not 'completely separate' from the Non-Disclosure Agreement. The Term Sheet is subject to the entire Non-Disclosure Agreement." (ECF No. 47 at 11.) Again,

9
Case 2:20-cv-00621-WED   Filed 08/04/22   Page 9 of 10   Document 79

"[r]econsideration is not an appropriate forum for rehashing previously rejected arguments." *Caisse Nationale de Credit Agricole*, 90 F.3d at 1270.

Likewise, while 37celsius could have made the second argument in its response to the defendants' motion for partial summary judgment, it does not explain why it failed to do so. *Cf. Caisse Nationale de Credit Agricole*, 90 F.3d at 1270 ("Reconsideration is not an appropriate forum for … arguing matters that could have been heard during the pendency of the previous motion."). Indeed, as the defendants point out, "37celsius does not claim that the Court made any factual errors, or that any 'newly discovered evidence' renders the Court's conclusions about the NDA and Term Sheet incorrect." (ECF No. 61 at 6.) Therefore, 37celsius's motion to reconsider on the basis that "the NDA's 'Hold Harmless' provision does not bar [its] claim for expectation damages under the Term Sheet" is denied.

**IT IS THEREFORE ORDERED** that the plaintiffs' motion for reconsideration is denied.

Dated at Milwaukee, Wisconsin this 4th day of August, 2022.

WILLIAM E. DUFFIN
U.S. Magistrate Judge