# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

37celsius Capital Partners, L.P., et al.,

              Plaintiffs,

      v.                                 Case No. 20-CV-621

Intel Corporation, et al.,

              Defendants.

# DECISION AND ORDER

Defendants Intel Corporation ("Intel") and Care Innovations, LLC ("Care") have filed a motion for summary judgment. (ECF No. 101.) All parties have consented to the full jurisdiction of this court pursuant to 28 U.S.C. § 636(c). (ECF Nos. 6, 7.) The court has jurisdiction under 28 U.S.C. § 1332(a)(1). The defendants' motion for summary judgment is ready for resolution.

### 1. Facts and Procedural History

The following facts are taken largely from Defendants' Statement of Proposed Material Facts (ECF No. 107). In responding to those proposed findings of fact, 37celsius generally failed to comply with Civil Local Rule 56(b)(2)(B)(1), which requires that any disagreement of a proposed finding of fact contain "specific references to the affidavits,

declarations, parts of the record, and other supporting materials relied upon[.]" With few exceptions, 37celsius's responses do not cite any evidence in support of its disagreement with proposed findings of fact. Thus, those proposed findings of fact are deemed admitted. *See* Civ. L. R. 56(b)(4).

In 2016, plaintiffs 37celsius Capital Partners, L.P. and 37celsius Capital Partners, LLC (collectively, "37celsius") discussed with Intel purchasing a controlling interest in Care, Intel's wholly owned subsidiary. (ECF No. 113, ¶ 10.) Intel was also in discussions with an entity named iSeed Ventures LLC ("iSeed") about acquiring Care. (*Id.*, ¶ 12.) In December 2016, Intel informed 37celsius that its efforts to sell Care to iSeed had been unsuccessful and re-engaged discussions with 37celsius. (*Id.*, ¶ 13.)

On January 4, 2017 (but with an effective date of June 6, 2016), 37celsius and Intel executed a Non-Disclosure Agreement and began negotiating 37celsius's potential investment in Care. (ECF No. 113, ¶ 14.) The Non-Disclosure Agreement stated that it was being entered into "in connection with a possible strategic transaction involving Care Innovations Holdings, LLC (the 'Transaction')." (ECF No. 28-2 at 1) (all citations reflect the ECF pagination.) In the Non-Disclosure Agreement, the parties agreed to maintain the confidentiality of certain information disclosed by the other party. (ECF No. 28-2, ¶ 2.) The Agreement further provided that "[e]ither party may terminate this Agreement at any time without cause upon written notice to the other party; *provided* that each party's

obligations for Confidential Information disclosed during the term of this Agreement will survive any termination." (ECF No. 28-2, ¶ 6) (emphasis in original.)

The Non-Disclosure Agreement also contained a provision entitled "Hold Harmless" that stated, in relevant part, that 37celsius and Intel each reserved "the right to terminate discussions and negotiations at any time and for any reason or no reason." (ECF No. 28-2, ¶ 9(a).) The provision also stated:

> Each party will be responsible for its own expenses in connection with the subject matter of the discussions or negotiations. Under no circumstances will either party be liable to the other for any costs or damages of any kind including without limitation incidental, consequential, special or speculative damages, lost profits or loss of business, in connection with not moving forward to conclusion of the discussions or negotiations.

(*Id.*, ¶ 9(b).) The provision further provided that

> it would be imprudent and unreasonable to rely upon the expectation of entering into any contract about the subject matter of the discussions or negotiations pertaining to the Transaction. Any effort by either party to complete due diligence, negotiate, obtain financing, prepare contracts or otherwise perform any of its obligations will not be considered evidence of intent to be legally bound by this effort.

(*Id.*, ¶ 9(c).) The Non-Disclosure Agreement also stated that it could not be amended except in writing signed by a duly authorized representative of the parties. (*Id.*, ¶ 13(e).)

On or around January 19, 2017, five days after executing the Non-Disclosure Agreement, 37celsius's founder, sole manager, and president, Alexander Kempe, emailed Intel about 37celsius's "good backing for funds," obtaining exclusivity from Intel, and closing the proposed transaction before February 14, 2017. (ECF No. 113, ¶¶ 15-16.) While

negotiating a term sheet with Intel and awaiting Intel's decision on the award of exclusivity, 37celsius began incurring costs to conduct due diligence on the proposed transaction. (*Id.*, ¶ 17.) On January 30, 2017, Kempe learned that Intel would grant 37celsius exclusivity for a "very short period of time" (*Id.*, ¶ 18), and the next day Intel sent 37celsius a Term Sheet which included an exclusivity provision (*Id.*, ¶ 19).

The Term Sheet described a proposed transaction whereby 37celsius and Intel would form a new limited liability company, Newco, to own and operate Care's direct parent, Care Innovations Holdings, LLC. (ECF No. 113, ¶ 20.) The terms and conditions of the Term Sheet were subject to 37celsius's "satisfactory commercial and legal due diligence and the execution by the parties hereto or their authorized representatives of a definitive purchase agreement and any other documents or agreements necessary to effect the transaction contemplated hereby." (ECF No. 29-2 at 2.) The Term Sheet described the proposed transaction this way:

> 37c will contribute its Cash Contribution to Newco in exchange for a 70% interest in Newco (on a fully diluted basis).
>
> Intel will contribute all of the outstanding membership interest of Care Innovations in exchange for a 15% interest in Newco (on a fully diluted basis).
>
> The remaining 15% fully diluted equity will be reserved for issuance as incentive compensation to existing and future management of Care Innovations, LLC.
>
> Such contributions are referred to as the "Transaction".

(*Id.*) 37celsius's Cash Contribution was set at $12 million, to be "paid directly to Newco in immediately available funds." (*Id.*) The "Closing Date" was set at "[n]o later than February 14, 2017." (*Id.*) The Term Sheet had a Confidentiality provision that provided that the Term Sheet is confidential to the parties and their representatives "and is subject to the Corporate Non-Disclosure Agreement entered into between 37c and Intel on June 6, 2016, which continues in full force and effect (the 'Confidentiality Agreement')." (*Id.* at 4.)

The Term Sheet's "Exclusivity" provision stated that, until the Term Sheet terminated,

> neither Care Innovations nor any of its representatives, officers, employees, directors, agents, equityholders or affiliates nor Intel shall (a) initiate, solicit, entertain, negotiate, accept or discuss, directly or indirectly, any proposal or offer from any person or group of persons (other than 37c and its affiliates) to acquire all or any significant part of the business and properties, equity interests of Care Innovations and/or its subsidiaries, whether by merger, purchase of equity, purchase of assets or otherwise (an "Acquisition Proposal"), (b) provide any non-public information to any third party in connection with an Acquisition Proposal or (c) enter into any agreement, arrangement or understanding requiring it to abandon, terminate or fail to consummate the Transaction with 37c.

(ECF No. 29-2 at 4.)

The Term Sheet's "Termination" provision stated:

> This Term Sheet will automatically terminate and be of no further force and effect upon the earlier of (a) the execution of a definitive purchase agreement by 37c and Intel, (b) mutual agreement of 37c and Intel and (c) written notice of termination of this Term Sheet by Intel, provided such termination notice shall be effective no earlier than February 2, 2017.

(ECF No. 29-2 at 5.)

The Term Sheet also contained a "No Binding Agreement" provision in which the parties agreed that

> [t]his Term Sheet reflects the intention of the parties, but for the avoidance of doubt, neither this Term Sheet nor its acceptance shall give rise to any legally binding or enforceable obligation on any party, except with regard to the sections hereof entitled "Confidentiality", "Exclusivity", "Governing Law", and "Third Party Beneficiaries". No contract or agreement providing for any transaction involving Care Innovations shall be deemed to exist between 37c and any of its affiliates and Intel unless and until a final definitive agreement has been executed and delivered.

(ECF No. 29-2 at 5.) And, finally, in a provision entitled "No Reliance," the parties agreed in relevant part that

> neither this Term Sheet nor any negotiations or discussions between any party obligates either party to enter into any further agreement. Moreover, unless and until the parties sign and deliver a definitive agreement with respect to a particular transaction, neither party will be under any legal obligation of any kind whatsoever regarding any transaction by virtue of this Term Sheet or any written or oral expression with respect to any transaction (including without limitation the preparation or signing of any letter of intent or term sheet) by any of the parties or their representatives except for the matters specifically agreed to in this Term Sheet.

(*Id.*) The Term Sheet stated that "[t]he parties will work to close the transaction as quickly as possible after signing, subject solely to the receipt of the third party consents set forth on Exhibit B." (*Id.* at 3.) The Term Sheet did not require either party to close the proposed transaction. (ECF No. 113, ¶ 21.)

The parties proceeded to work toward closing, with Kempe emailing Intel a "closing timeline" whereby February 10 would be the "Target Closing" date and February 13 would be reserved as a "Back up Closing" date. (ECF No. 113, ¶ 31.)

Intel responded that it had internal approval for the transaction "[u]nless there are any material changes from the term sheet." (*Id.*, ¶ 32.) Intel asked Kempe, "with regards to your [limited partners] – with the exclusivity period, did they all commit? When do they fund?" (*Id.*) On February 4, Kempe replied that 37celsius "ha[d] the money committed" and was prepared to fund the transaction within two days after 37celsius and Intel agreed on final transaction documents. (*Id.*, ¶ 33.) Despite Kempe's assurance, 37celsius was still seeking funding for the $12 million cash contribution. (*Id.*, ¶ 34 (citing ECF No. 102-25 at 2 (stating in an email on February 4 that "we have $1-3MM though may be at risk due to timing … if we had more time we would be able to get at least $6 if not $12")).)

As set forth in a February 13, 2017, Letter Agreement, in order for 37celsius to meet its obligation to make the capital contribution in cash, 37celsius "requested that Intel provide to 37celsius advance copies of the Proposed Contribution Agreement and the Proposed Transaction Documents bearing the signature of authorized persons of Intel[.]" (ECF No. 4-22 at 17.) The Letter Agreement provided that, by February 14, 2017, 37celsius was to provide Intel with satisfactory confirmation that 37celsius would meet its financial obligation. (ECF No. 113, ¶ 36.) Failure to provide such confirmation "satisfactory to Intel in its sole and absolute discretion" by 3:00 p.m. on February 14, 2017, would result in

returning the signature pages to the respective parties and no closing taking place. (ECF No. 4-22 at 17.)

The Letter Agreement further stated that, "while advance copies of the signature pages to the Proposed Contribution Agreement and the Proposed Transaction Documents are being provided today, the Proposed Contribution Agreement and the Proposed Transaction Documents shall not be deemed executed or delivered by any of the parties." (ECF No. 4-22 at 17.) Intel and 37celsius signed the proposed final transaction documents and exchanged advanced copies of the signature pages to be held in escrow while 37celsius obtained and delivered its $12 million cash contribution. (ECF No. 113, ¶ 39.) The proposed Contribution Agreement provided that, together with an Amended and Restated Operating Agreement, it "supersedes all prior agreements (including the Letter of Intent, dated June 6, 2016, among Affiliates of the Parties and the Term Sheet prepared by the Parties)." (*Id.*, ¶ 37; ECF No. 102-92 at ¶ 8.11.)

On February 14, 2017, when 37celsius was unable to confirm it could meet its $12 million contribution obligation, the transaction did not close. (ECF No. 113, ¶ 47.) Intel sent a written notice to 37celsius stating that "it ha[d] not received satisfactory confirmation that 37celsius will meet the Financial Obligation" and, accordingly, 37celsius was "to return the signature pages provided to them by Intel, and the Proposed Contribution Agreement and the Proposed Transaction

Documents shall not become effective or be deemed executed or delivered, and the Closing shall not occur." (*Id.*, ¶ 48; ECF No. 4-22 at 21.)

After failing to close on February 14, Intel told Kempe that it understood he was working to get funding in place by February 21 and that Intel would seek internal approval for a delayed signing and closing on February 21. (ECF No. 113, ¶ 50.) Intel said it "would strongly encourage [Kempe] to get the entire $12 million in funding lined up" by February 21. (*Id.*) Kempe responded, "Thank you and I will await the decision." (*Id.*, ¶ 51.) Kempe never received approval from Intel for a February 21 closing, but "decided to proceed regardless." (*Id.*, ¶ 52.) 37celsius was still unable to close on February 21, lacking approximately $2.5 million in necessary funds. (*Id.*, ¶ 53.)

Prior to the February 14 closing date, Intel's counsel reminded 37celsius's counsel that "this is still a competitive process and we have not foreclosed any of our options." (ECF No. 113, ¶ 58.) Intel also told Kempe it had another potential buyer available if 37celsius failed to close as planned, and Kempe expressed to others that, "[u]nless we close and fund Tuesday [February 14] I am convinced we loose [sic] this deal." (*Id.*, ¶ 59.) After the deal failed to close on February 14, Kempe was aware Intel was "working hard to close" with another buyer that had "$18 [million] cash upfront." (*Id.*, ¶ 60.) Kempe discussed this fact with his lawyers and colleagues and decided not to "play the exclusivity card" at that time, but to think

"strategically" about when "to let [Intel] know that they have not yet terminated [the] exclusivity period." (*Id.*, ¶¶ 61-64.)

After February 21, with 37celsius still struggling to gather funding, Kempe began pursuing different deal terms whereby 37celsius would contribute only $6.5 million in cash at closing, with the balance taken on as debt by Newco. (ECF No. 113, ¶ 54.) Kempe was aware the proposal was unlikely to be successful or received favorably by Intel, noting that it would be an "unusual" arrangement, as the security interest "is really for the benefit of just one owner (and not Intel)." (*Id.*, ¶ 57.) Regardless, 37celsius never obtained enough money to fund even this new proposal. (*Id.*, ¶ 69.)

On March 1, 2017, Intel informed 37celsius it had closed with a different party, iSeed, citing 37celsius's "inability to close the deal as originally planned," "the new debt element," and the "overall lower valuation [of 37celsius's proposal versus] the other deal" as reasons Intel did not move forward with 37celsius. (ECF No. 113, ¶ 70.) Several days later Kempe asserted 37celsius's exclusivity claim, at which time Intel "firmly" told Kempe that Intel and 37celsius had not been in exclusivity. (*Id.*, ¶¶ 66-67.)

After learning that he had lost out on the deal, Kempe wrote to others, "We lost the deal to the [competitor] who ended up paying more a real bummer, but

we were in a competitive bid situation and that's the risk you take." (ECF No. 113, ¶ 71.)

Two years later, in April 2019, 37celsius filed this suit in the Circuit Court for Milwaukee County. (ECF No. 113, ¶ 4.) The complaint contained four causes of action, each against both Intel and Care: breach of contract, breach of implied covenant of the duty of good faith and fair dealing, unjust enrichment, and promissory estoppel. (ECF No. 1-1 at 13-15.) The state court dismissed all but the breach of contract claim against Intel and the promissory estoppel claim against Care. (ECF No. 1-2.) The action was then removed to this court based on the diversity of the citizenship of the parties. (ECF No. 1, ¶ 11.)

37celsius alleged damages, including attorneys' fees and costs, lost profits and value, and reputation damages. (ECF No. 4-35, ¶ 57.) This Court granted summary judgment dismissing 37celsius's claim for lost profits and value damages. (ECF No. 47.) Six months later, 37celsius filed a motion to reconsider that decision (ECF No. 57), which the Court denied (ECF No. 79).

## 2. Summary Judgment Standard

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable

substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

### 3. Analysis

In moving for summary judgment the defendants contend that Intel terminated the Term Sheet and thus did not breach the Term Sheet's Exclusivity provision by closing with iSeed. (ECF No. 106 at 15.) Defendants separately argue that 37celsius suffered no

reliance damages and any reputational damages are not recoverable. (*Id.* at 13, 19.) Defendants further contend that 37celsius cannot prove (*Id.* at 19) and waives its promissory estoppel claim against Care. (ECF No. 114 at 8.)

### 3.1 Exclusivity

To prevail on a breach of contract claim a plaintiff must show: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

Defendants contend that closing with iSeed did not breach the Exclusivity provision because the Term Sheet terminated on February 13, under subsection (a) of the Termination provision, when the parties signed final transaction documents. (ECF No. 106 at 15.) Defendants also contend that, even if the Term Sheet was not terminated on February 13, it was terminated on February 14 under subsection (c) of the Termination provision when Intel sent the written notice. (*Id.*)

37celsius disputes that Intel ever terminated the Term Sheet and corresponding Exclusivity provision and contends that Intel breached the Exclusivity provision by negotiating and closing with iSeed. (ECF No. 112 at 13.)

Subsection (a) of the Term Sheet's Termination provision stated that the Term Sheet would terminate on "the execution of a definitive purchase agreement by 37c and Intel." (ECF No. 29-2 at 5.) Although by February 13 37celsius and Intel had agreed on proposed final transaction documents and exchanged advance copies of the signature pages, their

Letter Agreement expressly stated that that exchange shall not result in the proposed transaction documents being deemed executed or delivered by any of the parties. (ECF No. 4-22 at 17.) Instead, the transaction documents were to become effective only after 37celsius provided satisfactory confirmation of funds. (*Id.*) 37celsius did not provide satisfactory proof of funds. (ECF No. 113, ¶¶ 47-48.) As a result of 37celsius's inability to meet its financial obligation, the parties never executed a definitive purchase agreement, and the Term Sheet was not terminated under subsection (a) of its Termination provision.

But the Term Sheet also could be terminated under subsection (c) of the Termination provision, upon "written notice of termination of this Term Sheet by Intel, provided such termination notice shall be effective no earlier than February 2, 2017." (ECF No. 29-2 at 5.) The Term Sheet, including its exclusivity provision, was never intended to be a long-term agreement. It was only to be in effect until the parties had time to negotiate final transaction documents, with a closing that was to occur "[n]o later than February 14, 2017." (*Id.* at 2.) Kempe knew that Intel would close with someone else if 37celsius was unable to close by the 14th. (*Id.*, ¶ 59.) On February 14, 37celsius was unable to confirm that it could meet its financial obligation, and Intel sent it written notice that "the Closing shall not occur." (ECF No. 113, ¶¶ 47-48; ECF No. 4-22 at 21.)

37celsius's inability to close according to the terms of the final transaction documents did not breathe new life into the Exclusivity provision in the Term Sheet. The Term Sheet and corresponding Exclusivity provision were terminated on February 14

upon written notice by Intel that the closing would not occur due to 37celsius's inability to meet its financial obligations. Intel thus did not breach exclusivity by closing with iSeed on March 1.

### 3.2 Reliance Damages

Defendants contend that 37celsius suffered no damages. (ECF No. 106 at 13.) Defendants also argue that 37celsius cannot prove reliance damages from any alleged breach because it was unable to close and continued incurring expenses after learning Intel was negotiating with a competitor. (*Id.* at 13-16.)

A plaintiff must show that it suffered damages as a result of a breach. *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. 7471, 2013 WL 5621678, at \*13 (Del. Ch. Sept. 30, 2013). Specifically, the plaintiff "must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." *Id.* "A plaintiff must prove its damages by a preponderance of the evidence." *Id.* at \*19.

For the breach of a preliminary agreement, reliance damages are generally the appropriate remedy. *SIGA Techs. Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 349 (Del. 2012) (citing *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 519 F.3d 421 (8th Cir. 2008) (applying New York law)). When a plaintiff is unable to close a deal, it may still recover reliance damages "measured by its actually-incurred costs and expenses." *Id.* at 348; 3 Voss on Delaware Contract Law § 14.27 (2024). However, the plaintiff must still show that any

reliance damages were caused by the alleged breach. *PA Holdings Ltd. v. Arthur D. Little, Inc.*, No. 1-6156, 2001 WL 1335007, at *2 (S.D.N.Y. Oct. 30, 2001) (applying Delaware law).

The purpose of breach of contract remedies generally is "to give the non-breaching party the benefit of the bargain by putting that party in the position it would have occupied but for the breach." *Genecor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000). "In assessing damages for breach of contract and related claims, it is therefore important to consider how the positions of the parties would differ in the 'but-for' world — i.e., the hypothetical world that would exist if the Agreement had been fully performed." *eCommerce Indus.*, 2013 WL 5621678, at *43; *see, e.g.*, *Truinject Corp. v. Galderma S.A.*, 694 F. Supp. 3d 491, 502 (D. Del. 2023) (finding that "no reasonable jury could find that Defendants' breach of contract harmed [plaintiff's] ability to enter into a deal" and, having alleged no harm arising from the breach of contract, granting summary judgment of no damages); *In re Morrow Park Holding LLC*, No. 2017-36, 2022 WL 3025780, at *24-25 (Del. Ch. Aug. 1, 2022) (finding the plaintiff's breach of contract claim regarding defendant's refusal to allow plaintiff to exercise its purchase right failed because plaintiff did not prove it was willing and able to close by the deadline and thus "would be no differently situated today but for" the defendant's breach).

The goal of reliance damages is to allow the plaintiff to recover for "efforts that were to [its] detriment and thereby placed [it] in a worse position." *Fairbrook Leasing, Inc.*, 519 F.3d at 430 (quoting *Farash v. Sykes Dataronics, Inc.*, 452 N.E.2d 1245, 1246 (N.Y. 1983)).

The plaintiff's damages are "limited to the amount that it expended *in reliance on* the Debtor's promise of exclusive negotiations." *PA Holdings Ltd.*, 2001 WL 1335007, at *1 (emphasis added) (quoting *In re 131 Liquidating Corp.*, 44 F. Supp. 2d 552 (S.D.N.Y. 1999)). The plaintiff may only recover "the expenses he incurred by being misled, in violation of the parties' agreement … into continuing to negotiate futilely." *Id.* at *2 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 96 F.3d 275 (7th Cir. 1996)).

Even if Intel had breached the Exclusivity provision, 37celsius was not harmed by any such breach. Even had Intel never dealt with iSeed, by February 14 37celsius was short of the funds needed to close. (ECF No. 113, ¶¶ 34, 47.) On Kempe's proposed delayed closing date, February 21, 37celsius was still short of the necessary funds. (*Id.*, ¶ 53.) Intel was not in any way responsible for 37celsius's inability to meet its obligations. (ECF No. 28-2, ¶ 9(a).) Had 37celsius come up with the money it was supposed to by the closing date, the deal would have gone through notwithstanding any negotiations Intel was having with other parties.

Even if 37celsius were somehow in a worse position because of the alleged breach, 37celsius nevertheless did not rely *on* a promise of exclusive negotiations after February 14 because it was well aware that Intel was no longer dealing with 37celsius exclusively. (ECF No. 113, ¶¶ 58-65.) Even prior to February 14 Kempe knew Intel was dealing with a competitor. (*Id.*, ¶¶ 58-59.) After 37celsius failed to close on February 14, Kempe knew that Intel was "working hard to close" with another buyer that had "$18 [million] cash

upfront." (*Id.*, ¶ 60.) Despite knowing this, Kempe kept working to close and later described losing the deal as "the risk you take" when working in that type of "competitive bid situation." (*Id.*, ¶ 71.)

None of 37celsius's expenses were a result of "being misled" into thinking it was working in exclusivity with Intel. Because 37celsius was not misled into relying on the promise of exclusivity, it could not receive reliance damages.

### 3.3 Reputational Damages

37celsius maintains that it is entitled to damages for harm to its reputation. (ECF No. 112 at 3.) But Delaware generally does not recognize claims for reputational damages in breach of contract cases. *See Chemipal Ltd. v Slim-Fast Nutritional Foods Int'l*, 350 F. Supp. 2d 582, 595 (D. Del. 2004) ("[I]t appears that Delaware law does not permit damages for … reputational harm."); *Crowell Corp. v. Himont USA, Inc.*, No. 86C-11-125, 1994 WL 762663, at *3 (Del. Super. Ct. Dec. 7, 1994) ("Under Delaware law, consequential damages in the form of good will, lost future profits, and lost customers are not awarded in breach of contract actions. The Delaware courts have consistently found these damages to be speculative in nature, and; [sic] therefore, have barred recovery for them." (citations omitted)). Confronted with this law, 37celsius provides no response.

By providing no support for its undeveloped argument that it should receive reputation damages, 37celsius forfeits this claim. *See Scholz v. United States*, No. 16-1052, 2019 WL 13155222, at *2 (E.D. Wis. June 14, 2019); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686

F.3d 378, 386 (7th Cir. 2012); *see also Lasakowski v. Wallis*, 205 A.2d 825, 826 (Del. 1964) ("Recovery may not be had for merely speculative or conjectural damages.").

### 3.4 Promissory Estoppel

Defendants argue that 37celsius cannot recover on a promissory estoppel theory against Care because 37celsius cannot prove any elements of the claim. (ECF No. 106 at 19.)

A claim for promissory estoppel requires the plaintiff to "demonstrate by clear and convincing evidence that: '(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.'" *Chrysler Corp. (Delaware) v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003).

The only "promise" 37celsius alleges as the basis of its claim against Care is the "promise of exclusivity" made in the Term Sheet negotiated with Intel. (ECF No. 113, ¶ 85.) 37celsius admits that this promise was exclusively communicated to it by Intel employees. (*Id.*, ¶ 86.) 37celsius thus cannot use the Term Sheet as the basis of the "promise" at the heart of the promissory estoppel claim against Care.

As this Court previously explained, 37celsius also could not reasonably rely on any promise from Care regarding a sale of Intel's shares:

Care was Intel's wholly owned subsidiary. (ECF No. 38, ¶ 4.) The letter from 37celsius to Intel accompanying the draft Term Sheet reads: "[W]e are pleased to provide this letter, which sets forth the key terms and conditions of a proposed transaction whereby 37c or one of its affiliates would invest $12 million in Care Innovations for a 70% interest in Care Innovations, with Intel Corporation *retaining* a 15% interest…" (ECF No. 30-2 at 2) (emphasis added). A parent company and its wholly owned subsidiary may be separate legal entities, but a wholly owned subsidiary cannot independently sell its parent company's interest because it by definition does not own that interest. *Cf. Mitchell v. Hawley*, 83 U.S. 544, 550 (1872) ("No one in general can sell personal property and convey a valid title to it unless he is the owner or lawfully represents the owner."). …. Thus, 37celsius could not reasonably rely on any promise Care made to sell Intel's shares.

(ECF No. 47 at 17.)

And as this Court further previously explained, 37celsius cannot show justice requires enforcing any promise by Care:

[G]iven that 37celsius could not have reasonably expected to acquire Care, this is not a case where justice would require enforcing whatever promise Care may have made to 37celsius. *Compare with Chrysler Corp. v. Quimby*, 144 A.2d 123, 133-34 (Del. 1958) (finding that justice required enforcement of a promise made when the parties' standing franchise agreement was breached).

(ECF No. 47 at 19.)

Despite this Court's prior rejection of a promissory estoppel claim against Care, 37celsius now adds only a conclusory claim that Intel was acting as an agent for the sale of Care and bound Care to the provisions of the Term Sheet. (ECF No. 112 at 16.) But it provides no support for that contention. Nor does it explain how this would satisfy a claim of promissory estoppel against Care. This unsupported argument is insufficient to

survive summary judgment. *Stewart Title Guar. Co. v. Residential Title Servs., Inc.*, 607 F. Supp. 2d 959, 966 (E.D. Wis. 2009) ("Arguments not developed in a meaningful way are waived." (citing *Cent. States, S.E. & S.W. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999), (granting summary judgment))).

4. **Conclusion**

For the reasons set forth above,

**IT IS THEREFORE ORDERED** that defendants' motion for summary judgment on 37celsius's breach of contract claim (ECF No. 101 at 12) is granted.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment on 37celsius's promissory estoppel claim (ECF No. 101 at 19) is granted.

**IT IS FURTHER ORDERED** that the defendants' motion to exclude testimony of 37celsius's expert (ECF No. 103) is dismissed as moot.

**IT IS FURTHER ORDERED** 37celsius's breach of contract claim and promissory estoppel claim are dismissed with prejudice. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of September, 2024.

William E. Duffin

WILLIAM E. DUFFIN

U.S. Magistrate Judge